ORIGINAL

FILED
JUN 29 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

NORTHROP GRUMMAN CORPORATION,

Plaintiff,

v.

UNITED STATES,

Defendant.

No. 07-482 C

Judge: ______________

**COMPLAINT**

For its Complaint in this action, Plaintiff alleges as follows:

**PARTIES**

1. Plaintiff, Northrop Grumman Corporation ("Northrop Grumman"), is a corporation organized and existing under the laws of the State of Delaware, with its principal corporate offices in Los Angeles, California.

2. Defendant is the United States of America, acting through the Defense Contract Management Agency ("DCMA").

**JURISDICTION**

3. Northrop Grumman and the United States are parties to numerous contracts, including but not limited to Contract No. N0003-03-C-0005, which are assigned for contract administration purposes to DCMA and subject to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-613. Contract No. N0003-03-C-0005 has been selected as a representative contract for the purpose of this action.

4. By letter dated July 7, 2006, the DCMA Defense Corporate Executive ("DCE") issued a contracting officer's final decision, assessing penalties in the amount of $33,681,394,

plus interest, for allegedly unallowable costs that were included in Northrop Grumman's fiscal year 2003 corporate overhead submission. The DCE's final decision asserted a government claim in that amount pursuant to Federal Acquisition Regulation ("FAR") section 52.242-3 and 42.709-4.

5. This Court has jurisdiction over this action pursuant to sections 10 of the Contract Disputes Act, 41 U.S.C. § 609, and the Tucker Act, 28 U.S.C. § 1491(a).

## SUMMARY OF FACTS

### I. INTRODUCTION

6. Between 1993 and 1998, Northrop Grumman established several long-term incentive and retention-based compensation plans for its employees. These plans included, among others, a Restricted Performance Stock Rights ("RPSR") plan.

7. The RPSR plan is a deferred compensation stock award paid to key employees as part of Northrop Grumman's 1993 Long Term Incentive Stock ("LTIS") plan. The RPSR award amounts are based on Northrop Grumman's stock price on the date of the grant. Under the terms of the 1993 LTIS plan, 30 percent of the awarded shares are "fixed" and do not vary based on Northrop Grumman's performance. The remaining 70 percent of the awarded shares are considered "variable," and the amount ultimately paid depends on Northrop Grumman's performance over a five-year period, as measured by Northrop Grumman's Total Shareholder Return ("TSR") compared to the TSR of a group of peer companies. The TSR is measured by the value at the end of the performance period (*i.e.*, the ending investment value) of $100 invested in a company at the beginning of the performance period. The following formula is used for computing Northrop Grumman's TSR as a percentage of the comparator group TSR: (Northrop Grumman Ending Investment Value/Comparator Group Ending Investment Value) – 1 = Northrop Grumman's TSR. Consequently, employees who receive RPSR awards may earn more or less than the awarded shares depending on Northrop Grumman's comparative TSR performance during the five-year performance period. The most highly compensated employees

do not receive a guaranteed fixed amount; their RPSR grants are considered 100 percent variable.

8. The last RPSR grant under the 2003 LTIS plan was made in 1998. The 1998 RPSR grant consisted of one main grant issued on December 16, 1998 and twenty-four interim grants issued during 1999 through 2001.

9. In compliance with government contract cost accounting regulations, Northrop Grumman measured and assigned the costs of the 1998 RPSR grant over the five-year performance period.

10. For government contract cost accounting purposes, Northrop Grumman claimed the 1998 RPSR grant costs from 1999 through 2002 using a performance factor of 75 percent, comprised of a fixed performance factor of 30 percent and a variable performance factor of 45 percent, based on anticipated TSR performance. Starting in 2001, for financial accounting purposes, Northrop Grumman adjusted the performance factor to 150 percent, comprised of a fixed performance factor of 30 percent and a variable performance factor of 120 percent, due to its expectation that higher than previously anticipated performance goals would be achieved. However, for government contract cost accounting purposes, Northrop Grumman's 2001 and 2002 incurred cost claims were still based on the 75 percent performance factor.

## II. DISPUTE ABOUT THE ALLOWABILITY OF THE RPSR COSTS

11. In several incurred cost and forward pricing audit reports, the Defense Contract Audit Agency ("DCAA") evaluated the terms of the 1993 LTIS plan, and took exception to the variable portion of the costs paid under the RPSR plan. DCAA also took exception to several other categories of costs not relevant to this action. In these audit reports, DCAA took the position that the variable portion of the costs paid under the RPSR plan were unallowable under FAR 31.205-6(i). FAR 31.205-6(i), in effect at the time, provided in pertinent part: "Any compensation which is calculated, or valued, based on changes in the price of corporate securities is unallowable."

12. Northrop Grumman disagreed with DCAA position. It was (and still is) Northrop Grumman's position that the RPSR plan is an allowable form of incentive compensation under FAR 31.205-6, and that FAR 31.205-6(i) is inapplicable because the variable portion of the costs paid under the RPSR plan is not calculated, valued or based on changes in the price of corporate securities. Rather, the variable portion of the RPSR plan is based on Northrop Grumman's TSR as compared to the TSR of a group of peer companies. The RPSR plan sets compensation levels in a range that reflects expected performance. The actual amount of RPSR compensation is not determined by changes in the market value of Northrop Grumman's stock. Rather, the TSR is indexed against a group of Northrop Grumman's peer companies. Consequently, even if the market value of Northrop Grumman's stock decreased, the RPSR payments would still increase so long as Northrop Grumman's TSR exceeded the TSR of the comparator companies. The relative TSR is an excellent tool for measuring company performance. By indexing the TSR to other peer companies, any external market forces that could affect ultimate market value are eliminated, leaving only performance differences created by executive leadership.

13. Under FAR 42.302, the DCE is responsible for determining the allowability of Northrop Grumman's deferred compensation and corporate office expense costs, subject to Northrop Grumman's right to appeal any adverse determination.

14. Northrop Grumman and the DCE agreed to resolve their dispute regarding the allowability of the costs questioned by DCAA, including the RPSR costs, through alternative dispute resolution ("ADR"), using the services of an Armed Services Board of Contract Appeals ("ASBCA") settlement judge in a non-binding mediation.

## III. SETTLEMENT AGREEMENT AND MUTUAL RELEASE

15. As a result of the ADR, Northrop Grumman and the DCE entered into a Settlement Agreement and Mutual Release, dated June 14, 2002 (the "Settlement Agreement"). Recital E of the Settlement Agreement stipulates in pertinent part:

> As a result of the ADR, the Parties have reached an agreement to settle the disputes between them regarding the allowability of the Questioned Costs, and have further agreed to resolve the accounting of costs for the same

> compensation plans as have been or may be claimed by Northrop Grumman for fiscal years 2000-2003, including the administration of the 1998 RPSR Grant. For purposes of this Agreement, such costs shall be referred to collectively as "Settled Costs."

16. Article 1 of the Settlement Agreement's operative terms states in its entirety:

> Recognition of Costs. In consideration of the mutual promises, releases, and covenants set forth in this Agreement, the Government agrees to allow Northrop Grumman to include Settled Costs in the appropriate overhead rates for fiscal years 1997 – 2003, as agreed and set forth in Attachment A hereto.
>
> a. For fiscal years 1997 – 1999, Attachment A identifies the specific percentages and amounts to which the Parties have agreed.
>
> b. For fiscal years 2000 – 2003, the Parties shall apply the percentages identified in Attachment A.
>
> c. The Parties further recognize that the 1998 RPSR Grant was, and shall continue to be, accrued at 75% of the initial grant value and Northrop Grumman agrees that there will be no subsequent upward adjustment, irrespective of actual performance measurements under the 1998 RPSR plan.

17. The Settlement Agreement does not state that the 1998 RPSR grant costs are unallowable. On the contrary, Article 3 of the Settlement Agreement expressly states:

> No Admissions. This Agreement is made without acknowledgement by either Party of the allowability of any of the Settled Costs, is not precedent-setting, does not bind either Party with respect to the treatment of similar costs, and does not affect any other rights or obligations between the Parties. This Agreement does not limit the respective rights of either Party to raise any claim or defense or assert any portion or interpretation with respect to accounting practices for compensation costs that differ from those practices that produced the costs addressed in this Agreement.

18. The Settlement Agreement includes a mutual release of claims and liabilities, including of particular importance to this action, a release of penalties. Article 2 states:

> Release of All Claims. The Parties finally and forever fully release and discharge each other from any and all liabilities, claims, demands, costs, and damages arising out of or related to the Settled Costs. The Parties further agree that no penalties including, but not limited to, any penalties under FAR 31.110, FAR 42.709, FAR 52.242-3, 10 U.S.C. § 2324, 41 U.S.C. § 256, will be assessed against the Settled Costs.

19. It was the collective decision of the participants in the ADR process, including Northrop Grumman's principal representative and the DCE, that the Settlement Agreement should be kept confidential and its dissemination and disclosure very strictly limited. Accordingly, Article 5 of Settlement Agreement states:

> Confidentiality. In accordance with Article 16 of the ADR Agreement, each Party agrees to maintain and keep the terms of this Agreement completely confidential, and will not disclose any information concerning the amount or the terms of this Agreement to anyone except as required by law, legal process or order, or by subsequent written agreement by all of the Parties that disclosure of the terms of this Agreement are allowed. If any Party to this Agreement is required by any law, legal process or any order to disclose the Agreement to a third party, that Party required to disclose the terms of the Agreement shall notify the other Party in writing of the disclosure and the reasons for the disclosure at least five (5) calendar days before such disclosure is made to any third party.

20. Attached to the Settlement Agreement is a one-page document entitled, "Attachment A, Northrop Grumman Corporation ADR Settlement." Attachment A specifies the percentages for the fixed and variable portions of different years' RPSR grants that Northrop Grumman and the DCE agreed could be included in the Northrop Grumman's overhead expense claims. For the 1998 RPSR stock grant, Attachment A specifies a percentage of 70 percent.

## IV. INADVERTENT INCLUSION OF EXCESS 1998 RPSR GRANT COSTS IN NORTHROP GRUMMAN'S 2003 OVERHEAD EXPENSE CLAIM

21. Consistent with its obligations under Article 5 of the Settlement Agreement, Northrop Grumman undertook steps to maintain the confidentiality of the Settlement Agreement. Among other things, a decision was made in 2002 to separate Attachment A from the body of the Settlement Agreement, and to only provide copies of Attachment A – rather than the entire Settlement Agreement – to various personnel within the company, including those with responsibility for preparing the annual corporate overhead claim. Those who made this decision did so in the good faith belief that all necessary and operative information for purposes of later claim preparation and submission was contained in Attachment A. That assumption proved incorrect. As noted above, Article 1 paragraph c states: "The Parties further recognize that the

1998 RPSR Grant was, and shall continue to be, accrued at 75% of the initial grant value and Northrop Grumman agrees that there will be no subsequent upward adjustment, irrespective of actual performance measurements under the 1998 RPSR plan." There is no indication of this 75 percent RPSR ceiling in Attachment A.

22. The fact that Attachment A omitted any reference to the 75 percent RPSR ceiling was not immediately apparent, as there was no "true-up" required of costs associated with the 1998 RPSR grant during either 2001 or 2002 and hence the costs as reported during those years did not reflect a higher than agreed performance factor. Accordingly, it was not until the beginning of 2004, when Northrop Grumman began the preparation of its 2003 corporate overhead claim that there was any potential operation of the cap contained in the main body of the Settlement Agreement but not referenced in Attachment A.

23. As noted above, for government contract cost accounting purposes, Northrop Grumman claimed the 1998 RPSR grant costs from 1999 through 2002 using a performance factor of 75 percent, comprised of a fixed performance factor of 30 percent and a variable performance factor of 45 percent, based on anticipated TSR performance. Starting in 2001, for financial accounting purposes but not government contract cost accounting purposes, Northrop Grumman adjusted the performance factor to 150 percent, comprised of a fixed performance factor of 30 percent and a variable performance factor of 120 percent, due to its expectation that higher than previously anticipated performance goals would be achieved. For government contract cost accounting purposes, Northrop Grumman continued to use a performance factor of 75 percent for its 2001 and 2002 incurred cost claims.

24. A "true-up" adjustment was made in 2003 to include the difference between the 75 percent performance factor claimed in prior years and the actually achieved performance factor of 150 percent. In accordance with the terms of the Settlement Agreement, as reflected in Attachment A, only 70 percent of the variable portion of the 1998 RPSR grant costs was chargeable to government contracts. Therefore, the personnel responsible for preparing Northrop Grumman's corporate overhead proposal limited the amount included for variable

shares to 70 percent. However, the 70 percent was applied to an RPSR amount which was computed based on a performance factor of 150 percent, rather than 75 percent, as required by Article 1 paragraph c of the Settlement Agreement. As result, Northrop Grumman's 2003 corporate overhead proposal included 1998 RPSR Grant costs in excess of the amount permitted by the terms of the Settlement Agreement (referred to herein as "excess RPSR costs").

25. The Northrop Grumman employees responsible for preparing the 2003 corporate overhead claim followed a rigorous and well-documented internal control process. The 2003 corporate overhead claim was prepared under the supervision of the Corporate Director of Government Financial Relations. The internal control processes of the organization which compiles the costs included in the Long Term Incentive ("LTI") compensation portion of the corporate overhead submission as well as the organization responsible for review and approval of the submission require, by documented procedure, a review of advance agreements by the preparers and their supervisor. In accordance with these procedures, the accounting specialist who prepared the LTI portion of the submission reviewed Attachment A and confirmed that the amounts proposed were consistent with the 70 percent limitation. However, neither the accounting specialist nor her supervisor realized that there was an additional limitation in the body of the Settlement Agreement.

26. The 2003 corporate final indirect cost submission was submitted to the government on June 30, 2004. The corporate indirect costs were allocated to Northrop Grumman's business sectors and operating companies in accordance with Northrop Grumman's disclosed or established cost accounting practices and Cost Accounting Standard 403. Only a portion of the true-up of the 1998 RPSR grant amounts included in the 2003 corporate final indirect cost submission were actually charged to any government contracts.

## V. GOVERNMENT CLAIM FOR PENALTIES

27. DCAA audited Northrop Grumman's 2003 corporate final indirect cost submission, and on November 9, 2005, issued a draft audit report. The draft audit report took

exception to the costs associated with the true-up of the 1998 RPSR grant. DCAA's draft audit report concluded:

> We reviewed the basis for the claimed costs and found that, contrary to the terms of the ADR agreement, the contractor claimed the full amount using the 150 percent performance factor (less 30 percent of the variable portion that the contractor did remove from its submission to the government). Therefore, the contractor is in noncompliance with the ADR agreement which required that a 75 percent performance factor be used to calculate the claimed amount.

28. Northrop Grumman did not (and does not now) dispute that including the costs associated with the true-up of the 1998 RPSR grant in Northrop Grumman's 2003 corporate overhead submission was contrary to Article 1 paragraph c of the Settlement Agreement.

29. However, the draft audit report also asserted that, "since these costs were deemed unallowable in accordance with a previous advance agreement with the government, we believe these costs are subject to penalty under FAR 42.709." Citing FAR 42.709-1(a)(2), the draft audit report stated: "Since these costs were previously determined to be unallowable under the ADR agreement, we believe that the double penalties apply." Northrop Grumman denies that the excess RPSR costs included in the 2003 corporate overhead submission are unallowable, or that penalties are appropriate.

30. Northrop Grumman responded to the draft audit report by letter dated December 22, 2005. In the letter, Northrop Grumman stated that it "agrees that the calculation inadvertently included a 150% rate rather than the agreed to 75% rate but does not concur that this inadvertent calculation falls within the category of a level two penalty as stated in FAR 42.709(1)(a)(2)." Northrop Grumman's letter also explained how the mistake occurred, and suggested that a waiver of the penalty was appropriate in accordance with FAR 42.709-5.

31. By letter dated February 24, 2006, the DCE notified Northrop Grumman of his intent to impose a penalty of $33,681,394, plus interest.

32. Northrop Grumman responded to the DCE's notice by letter dated March 24, 2006. Northrop Grumman's letter made three primary points. First, while including the excess RPSR costs in the corporate overhead submission may have violated the terms of the Settlement

Agreement, the costs are neither expressly unallowable nor mutually agreed to be unallowable costs. Second, even if the excess RPSR costs were unallowable, the imposition of penalties would be contrary to FAR 42.709-5. That section requires the DCE to waive the penalties when the contractor demonstrates that (a) it has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in final indirect cost rate proposals, and (b) the unallowable costs subject to penalties were inadvertently incorporated into the proposal. Third, in any event, the $33,681,394 value calculated by DCAA was substantially overstated. Northrop Grumman's letter pointed out, for example, that DCAA's calculation of the penalty amount failed to take into consideration the following costs not subject to penalties: (a) costs allocated to subcontracts; (b) costs allocated to prime contracts under $550,00, and (c) costs that were never charged to any government contract because the amounts were included in the compensation for "top 5" executives that exceeded the limits established by FAR 31.205-6(p).

33. Northrop Grumman's March 24, 2006 letter demonstrated that Northrop Grumman has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals. Northrop Grumman satisfactorily participates in a self-governance program that meets all of the Department of Defense ("DoD") requirements. Northrop Grumman has detailed and specific accounting controls over its indirect costs; its personnel conduct compliance tests which demonstrate that the controls are effective; and DCAA's audits have not disclosed recurring instances of expressly unallowable costs.

34. Northrop Grumman's March 24, 2006 letter also demonstrated that the inclusion of the excess RPSR costs in the 2003 overhead cost proposal was inadvertent and occurred notwithstanding the exercise of due care.

35. At the DCE's request, DCAA evaluated Northrop Grumman's response to the DCE's notice of intent to impose a penalty. DCAA reported its findings by letter dated May 9,

2006. DCAA's letter agreed that the penalty amount calculated by DCAA was substantially overstated, but explained that DCAA lacked the data necessary to properly compute the amount. DCAA stated that the final penalty assessment should exclude amounts allocated to: (a) subcontracts; and (b) below threshold prime contracts, including (i) flexibly-priced contracts less than $550,000 awarded on or after January 19, 2005, (ii) flexibly-priced contracts less than $500,000 awarded between October 1, 1995 and January 18, 2005, (iii) flexibly-priced DoD contracts less than $100,000 awarded between October 23, 1992 and September 30, 1995, and (iv) most flexibly-priced DoD contracts awarded before 23 October 1992. In addition, DCAA stated that there should be a pro-rata reduction of the penalty amount for amounts allocated to over-ceiling executive compensation for "top 5" employees.

36. Notwithstanding Northrop Grumman's detailed response, and despite the requirement of FAR 42.709-5 to waive the penalty and DCAA's notification that the amount of the penalty was substantially overstated, the DCE on July 7, 2006 issued a final decision, imposing a level two penalty of $33,681,394, plus interest.

37. According to an analysis prepared in late December 2006, Northrop Grumman has determined that excess RPSR costs totaling approximately $7,647,600 were charged to covered contracts. Thus, even if penalties were appropriate (and they are not, for the reasons stated herein), the amount claimed by the DCE is significantly overstated.

**COUNT I**
**(Contrary to Law and Regulation)**

38. Northrop Grumman incorporates by reference paragraphs 1 through 37 of this Complaint as though set forth in full.

39. The DCE's final decision is contrary to law and regulation.

40. Penalties may be assessed under 10 U.S.C. § 2324(a) and FAR 42.709-1 only when the contractor has included in a final indirect cost rate proposal costs that are either "expressly unallowable" or previously "determined to be unallowable."

41. FAR 42.709-1(a)(1) provides:

> If the indirect cost is expressly unallowable under a cost principle in the FAR, or an executive agency supplement to the FAR, that defines the allowability of specific selected costs, the penalty is equal to – (i) The amount of the disallowed costs allocated to contracts that are subject to this section for which an indirect cost proposal has been submitted; plus (ii) Interest on the paid portion, if any, of the disallowance.

42. FAR 42.709-1(a)(2) provides: "If the indirect cost was determined to be unallowable for that contract before proposal submission, the penalty is two times the amount in paragraph (a)(1)(i) of this section." The DCE's final decision assesses "level two" penalties under FAR 42.709-1(a)(2).

43. The excess RPSR costs are not expressly unallowable. FAR 31.001 defines the term "expressly unallowable cost" as "a particular item or type of cost which, under the express provision of an applicable law, regulation, or contract, is specifically named and stated to be unallowable." No law, regulation or contract specifically names and states the excess RPSR costs to be unallowable.

44. The excess RPSR costs were not previously "determined to be unallowable." FAR 42.709-3(b) states that prior determinations of unallowability may be evidenced by (a) a DCAA Form 1, Notice of Contract Costs Suspended and/or Disapproved, (2) a contracting officer's final decision, (3) a prior court or board of contract appeals decision, or (4) a determination or agreement of unallowability under 31.201-6. Prior to Northrop Grumman's inadvertent inclusion of the excess RPSR costs in its 2003 corporate overhead submission, neither the DCE nor any other government official, court or board of contract appeals had ever made a determination that the excess RPSR costs were unallowable.

45. The excess RPSR costs are comprised entirely of costs of the "1998 RPSR Grant" as that term is used in the Settlement Agreement. The costs of the 1998 RPSR Grant are not included within the definition of "the Questioned Costs" as defined in recital B of the Settlement Agreement. However, the costs of the 1998 RPSR Grant are included within the definition of "Settled Costs" as defined in recital E of the Settlement Agreement. Recital E states in pertinent part:

> As a result of the ADR, the Parties have reached an agreement to settle the disputes between them regarding the allowability of the Questioned Costs, and have further agreed to resolve the accounting of costs for the same compensation plans as have been or may be claimed by Northrop Grumman for fiscal years 2000-2003, including the administration of the 1998 RPSR Grant. For the purposes of this Agreement, such costs shall be referred to collectively as "Settled Costs."

46. Pursuant to the terms of the Settlement Agreement, Northrop Grumman agreed to include only a specified percentage of the Settled Costs, including a specified percentage of the 1998 RPSR Grant costs, in its overhead rates for fiscal years 2000-2003. Although Northrop Grumman agreed to include only a specified percentage of the Settled Costs in its final indirect cost submissions, there was never any determination that Settled Costs in excess of the specified percentages were unallowable. To the contrary, Article 4 of the Settlement Agreement expressly states that the "Agreement is made without acknowledgement by either Party of the allowability of any of the Settled Costs, is not precedent setting, does not bind either Party with respect to the treatment of similar costs, and does not affect any other rights or obligations between the Parties." Furthermore, recital E of the Settlement Agreement, quoted above, draws a distinction between the "Questioned Costs" and the "Settled Costs." Recital E stipulates that the Parties intended to settle the "allowability of the Questioned Costs," but that the Parties merely intended to "resolve the accounting of costs for the same compensation plans as have been or may be claimed by Northrop Grumman for fiscal years 2000-2003." (Emphasis added).

47. Because the excess RPSR costs are neither "expressly unallowable" nor previously "determined to be unallowable," there is no basis for assessing penalties. The DCE's final decision is therefore contrary to law and regulation.

**COUNT II**
**(Accord and Satisfaction)**

48. Northrop Grumman incorporates by reference paragraphs 1 through 37 and 45 through 46 of this Complaint as though set forth in full.

49. The claim asserted in the DCE's final decision is barred by accord and satisfaction.

50. As noted above, the excess RPSR costs are a subset of the costs of the "1998 RPSR Grant," and the "1998 RPSR Grant" is included within the definition of "Settled Costs," as those terms are used and defined in the Settlement Agreement. The definition of Settled Costs expressly contemplates future costs because recital E states the parties' intent to "resolve the accounting of costs for the same compensation plans as have been or may be claimed by Northrop Grumman for fiscal years 2000-2003, including the administration of the 1998 RPSR Grant. For the purpose of this Agreement, such costs shall be referred to collectively as 'Settled Costs.'" (Emphasis added.)

51. Article 2 of the Settlement Agreement expressly waives and releases the government's ability to assess penalties against the Settled Costs. Article 2 states in pertinent part: "The Parties further agree that no penalties including, but not limited to, any penalties under FAR 31.110, FAR 42.709, FAR 52.242-3, 10 U.S.C. § 2324, 41 U.S.C. § 256, will be assessed against the Settled Costs."

52. The DCE's final decision asserts a claim for penalties as a result of Northrop Grumman's inclusion of a larger percentage of Settled Costs than permitted by the terms of the settlement agreement. Consequently, the DCE's final decision purports to assess penalties against Settled Costs.

53. The DCE's claim for assessment of penalties against the Settled Costs is barred by Article 2 of the Settlement Agreement.

**COUNT III**
**(Abuse of Discretion)**

54. Northrop Grumman incorporates by reference paragraphs 1 through 37 of this Complaint as though set forth in full.

55. The DCE abused his discretion by failing to waive any applicable penalties in accordance with FAR 42.709-5. FAR 42.709-5(c) provides:

> The cognizant contracting officer shall waive the penalties at 42.709-1(a) when –

> (c) The contractor demonstrates, to the cognizant contracting officer's satisfaction, that –
>
> (1) It has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals (*e.g.*, the types of controls required for satisfactory participation in the Department of Defense sponsored self-governance programs, specific accounting controls over indirect costs, compliance tests which demonstrate that the controls are effective, and Government audits which have not disclosed recurring instances of expressly unallowable costs); and
>
> (2) The unallowable costs subject to the penalty were inadvertently incorporated into the proposal; *i.e.*, their inclusion resulted from unintentional error, notwithstanding the exercise of due care.

56. When a contracting party is unilaterally vested with discretion, there is an implied obligation to exercise that discretion reasonably. In addition, FAR 42.709-5 specifically limits the contracting officer's discretion by (a) the use of imperative and mandatory language (*i.e.*, "the cognizant contracting officer shall") and (b) its detailed enumeration of factors to be considered.

57. In response to the DCE's notice of intent to impose penalties, Northrop Grumman demonstrated both (a) that it has established policies and personnel training and an internal control and review system that provide assurance that unallowable costs subject to penalties are precluded from being included in the contractor's final indirect cost rate proposals, and (b) that the excess RPSR costs were inadvertently incorporated into the 2003 corporate overhead proposal.

58. The DCE's refusal to waive the penalties was unreasonable under the circumstances, as well as arbitrary and capricious. The DCE therefore abused his discretion and violated FAR 42.709-5 by refusing to waive the penalties.

## COUNT IV
## (Arbitrary and Capricious)

59. Northrop Grumman incorporates by reference paragraphs 1 through 37 of this Complaint as though set forth in full.

60. The DCE's final decision asserts a claim for an amount that is significantly overstated.

61. The penalty amount was computed by DCAA. Before the DCE issued his final decision, DCAA informed the DCE that its calculation of the penalty amount was significantly overstated, and that it was necessary to exclude certain amounts from the final penalty assessment.

62. The DCE inexcusably failed to correct the penalty amount based on DCAA's revised assessment or to independently calculate a supportable penalty amount, and instead asserted a government claim in an amount known to be significantly overstated.

63. It is a breach of the implied obligation of good faith and fair dealing for a contracting party to knowingly assert an inflated claim against the other party. The DCE's final decision is therefore arbitrary and capricious.

## PRAYER FOR RELIEF

WHEREFORE, for the reasons set forth above, Northrop Grumman prays for relief as follows:

A. That the Court declare that the July 6, 2006 final decision is null and without effect.

B. That the Court declare that Northrop Grumman is not liable for penalties as a result of its inadvertent inclusion of excess RPSR costs in its 2003 corporate overhead proposal.

C. That the Court award costs, attorneys' fees, and such other and further relief as the Court may deem just and equitable in the circumstances.

Respectfully Submitted,

Dated: June 29, 2007

KAREN L. MANOS
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue N.W.
Washington, District of Columbia 20036
Telephone: (202) 955-8536
Facsimile: (202) 530-9533

Attorneys for Plaintiff
NORTHROP GRUMMAN CORPORATION

Of Counsel:
Christyne K. Brennan
GIBSON, DUNN & CRUTCHER, LLP
1050 Connecticut Avenue, NW
Washington, DC 20036